IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| LORI CHAVEZ-DeREMER,<br>SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR<br><br>Plaintiff,<br><br>v.<br><br>INTELLECTECHS, INC. and JERI PROPHET,<br><br>v.<br><br>INTELLECTECHS, INC. 401(k) PROFIT<br>SHARING PLAN, *solely as a Rule 19 Defendant*<br><br>Defendants. | Civil Case No. _____ |

## COMPLAINT

Plaintiff Lori Chavez-DeRemer, Secretary of Labor, United States Department of Labor ("the Secretary") hereby alleges:

1. This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq., and is brought to obtain relief under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132, in the form of equitable remedies that will redress violations, obtain appropriate equitable relief for breaches of fiduciary duties under ERISA Section 409, 29 U.S.C. § 1109, and obtain such further equitable relief as may be appropriate to enforce the provisions of Title I of ERISA.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

3.      Venue with respect to this action lies in the United States District Court for the Eastern District of Virginia, pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because Defendant IntellecTechs, Inc. ("IntellecTechs") was, at the time of many of the ERISA violations, headquartered, registered, and operated in this District. At all relevant times, IntellecTechs had a principal place of business at 195 S. Rosemont Road, Suite 103, Virginia Beach, Virginia. Defendant Jeri Prophet ("Prophet") resided in this District during the relevant period and was an employee of IntellecTechs.

## PARTIES

4.      The Secretary, pursuant to Sections 502(a)(2) and (5) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (5), has the authority to enforce the provisions of Title I of ERISA by, among other means, filing and prosecuting claims against fiduciaries and others who committed violations of ERISA.

5.      Defendant IntellecTechs provided Information Technology services to a variety of federal agencies, including but not limited to the Department of Defense and the Department of Veterans Affairs. At all relevant times, IntellecTechs exercised discretionary authority and discretionary control over plan assets in the IntellecTechs-SCA-TX 401(k) Profit Sharing Plan, now called the IntellecTechs, Inc. 401(k) Profit Sharing Plan, ("Plan" or "IntellecTechs, Inc. 401(k) Profit Sharing Plan"), including the payment of 401(k) contributions and payment of fees. At all relevant times, therefore, IntellecTechs was a fiduciary to the IntellecTechs, Inc. 401(k) Profit Sharing Plan under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). As a fiduciary, an employer whose employees are covered by the Plan, and an entity owned by fiduciary Jeri Prophet, IntellecTechs was a party in interest to the Plan under ERISA Sections 3(14)(A), (C) and (G), 29 U.S.C. §§ 1002(14)(A), (C), and (G) for the relevant time period.

6. Defendant Jeri Prophet was the Chief Executive Officer and majority owner of IntellecTechs. Prophet was a named fiduciary to the Plan, serving as the Plan Administrator and Plan Trustee. She directly performed the tasks of a plan administrator, including managing 401(k) contributions and paying fees from Plan assets. Because of her discretionary authority and control of Plan assets, Prophet was a fiduciary pursuant to ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). As a fiduciary and a majority owner and officer of IntellecTechs, Prophet was a party in interest to the Plan pursuant to ERISA Section 3(14)(A), (E) and (H), 29 U.S.C. § 1002(14)(A), (E) and (H).

7. The IntellecTechs, Inc. 401(k) Profit Sharing Plan is a retirement plan covered by ERISA and named as a defendant herein pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

## FACTUAL ALLEGATIONS

8. IntellecTechs and Prophet established the Plan on January 1, 2016. Prophet signed the relevant plan documents as both the Employer and the Trustee, and IntellecTechs was named as the Plan Administrator. After Defendants established the Plan, Prophet directly performed the tasks of administering the Plan.

9. Defendants established the Plan to hold fringe benefit contributions to provide retirement benefits for its employees who are covered by the McNamara-O'Hara Service Contract Act ("SCA"), 41 U.S.C. §§ 6701-6707.

10. The SCA applies to "any contract" that (1) "is made by the Federal Government or the District of Columbia," (2) "involves an amount exceeding $2,500," and (3) "has as its principal purpose the furnishing of services in the United States through the use of service employees." 41 U.S.C. § 6702(a). The SCA thus applies when the government hires service contractors to provide various services, such as computer services, cleaning federal buildings,

preparing meals, and groundskeeping. *See* 29 C.F.R. § 4.130 (illustrating types of contracts to which SCA applies). The service contractors, in turn, hire service employees to perform the work. *See* 41 U.S.C. § 6701(3); 29 C.F.R. § 4.113(d) (defining "service employees"). Every SCA-covered contract must contain contractual clauses setting forth the contractor's SCA obligations and must attach a wage determination issued by the Secretary of Labor, through the Department of Labor's Wage and Hour Division ("WHD"). *See* 41 U.S.C. § 6703; 29 C.F.R. § 4.6.

11. Congress passed the SCA in 1965 to ensure that service employees performing on federal service contracts receive at least the prevailing wages and fringe benefits for their work. Congress designed the SCA "to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies." S. Rep. No. 89-798 (1965). The SCA was also intended to prevent the federal government from being "a party to the depressing of labor standards in any area of the Nation." 111 Cong. Rec. 24,387 (1965) (Congressman O'Hara, SCA co-author). Pursuant to the SCA, WHD issues wage determinations for various job categories in different areas of the country. These wage determinations include hourly rates of pay and required fringe benefits, which are generally expressed as an hourly rate.

12. To meet the fringe benefits requirement, service contractors like IntellecTechs have the option of providing fringe benefits, which must be furnished pursuant to a bona fide plan, fund, or program, paying the fringe rate to the employees in cash, or providing a combination of fringe benefits and cash payments. *See* 41 U.S.C. § 6703(2); 29 C.F.R. § 4.170(b).

13. IntellecTechs, a service contractor required to comply with the SCA, elected to satisfy its SCA fringe benefit obligations by paying health and welfare benefits such as insurance premiums, and using the remaining funds to provide contributions to the IntellecTechs, Inc. 401(k) Profit Sharing Plan for its service employees working on SCA-covered contracts.

14. Defendants hired Axim Financial Group, LLC ("Axim") to perform administrative services for them in connection with these health and welfare benefits and the Plan. Axim marketed itself as a company that would administer fringe benefits for companies performing services for the U.S. Government under contracts regulated by the SCA. As a party providing services to the Plan, Axim is a party in interest to the Plan pursuant to ERISA Section 3(14)(B), 29 U.S.C. § 1102(14)(B).

15. Axim marketed itself to IntellecTechs and other service contractors as being able to "help government contractors lower overhead and reduce their compliance burden – all while improving contract profitability" as a "zero-net cost" service provider. Rather than having employers pay the administrative costs associated with providing fringe benefits to their employees, costs that are normally borne by employers, Axim deducted its fees from the fringe benefits contributions which its service contractor clients are required to make on behalf of their service employees. This shifted a cost normally borne by the service contractor on to the service employees, reducing the employees' fringe benefits below the amount required by the SCA.

16. IntellecTechs and Axim executed the IntellecTechs, Inc. Employee Welfare Benefits Plans Trust Agreement ("Trust Agreement"). The Trust Agreement, effective January 1, 2018, states that IntellecTechs, which was identified as the "plan sponsor," was contracting with Axim to establish a Trust for the payment of fringe benefits. The Trust Agreement states

that "the Trust will hold plan assets until those assets are disbursed as benefit payments ... or are used to pay the administrative expenses of operating the Plan[] and the Trust."

17. On January 1, 2018, IntellecTechs and Axim executed a Provider/Client Agreement that specified the services Axim would provide to IntellecTechs, the fees Axim would charge for its services, and the procedures that Axim had agreed to follow when providing its services.

18. Pursuant to the Trust Agreement and Provider/Client Agreement, IntellecTechs paid health and welfare benefits for the service contractor employees, and contributed the remaining funds to the Trust. These employer contributions to the Trust were IntellecTechs, Inc. 401(k) Profit Sharing Plan assets. Axim then deducted a $40 Per Employee Per Month ("PEPM") fee from the Trust to pay itself for the services that it had provided and forwarded the remainder as 401(k) contributions to the Plan's asset custodian, John Hancock.

19. In accordance with the Provider/Client Agreement, Axim performed accounting and recordkeeping services for IntellecTechs, tracking fringe benefit disbursements for each employee based on the employee's hours worked and processing or monitoring information received from IntellecTechs regarding new hires, employee terminations, or other personnel changes; generated SCA compliance reports; maintained an online portal for IntellecTechs and its employees showing the fringe benefit disbursements Axim made for each employee; and responded to certain employee inquiries. Axim also represented in the Provider/Client Agreement that it would prepare certain reports and provide other assistance to IntellecTechs in the event IntellecTechs was investigated by the Department of Labor.

20. Employees also made contributions to the Plan, which Defendants withheld from employees' paychecks. These withholdings are Plan assets.

21. From 2015 to 2023, Defendants failed to forward more than $38,000 in employee contributions withheld to the Trust.

22. From 2015 to 2023, Defendants forwarded employee contributions to the Trust up to 160 days after they were due.

## COUNT I

### Impermissible Use of Retirement Plan Assets to Pay Employer's Expenses

23. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 22, inclusive.

24. When an employer deposits funds into a trust created for the purpose of providing retirement benefits, the funds become plan assets.

25. The Trust Agreement explicitly created a trust for the purpose of providing fringe benefits to Defendants' service contractor employees. Defendants deposited contributions in the Trust, which were forwarded to John Hancock as 401(k) fringe benefits contributions or used to pay the PEPM fees. These contributions to the Trust are Plan assets.

26. The Plan assets may only be used for the exclusive benefit of plan participants and their beneficiaries and defraying reasonable expenses of administering the plan. Plan assets may not legally be used to inure to the benefit of any employer. 29 U.S.C. § 1103(c).

27. The SCA requires that federal service contractors pay prevailing wages and fringe benefits to service employees working on covered federal service contracts. 41 U.S.C. § 6701, *et seq*. With exceptions not applicable here, the SCA's fringe benefit requirements are computed at an hourly rate set by WHD and are set forth in the wage determination included in the contract. 29 C.F.R. §§ 4.6(b), 4.172. During the period at issue, service contractors were required to

provide health and welfare fringe benefits ranging in value from $4.27 per hour to $4.80 per hour. *See* WHD All Agency Memorandum 217 (June 30, 2015); WHD All Agency Memorandum 239 (June 23, 2022). Service contractors may satisfy their SCA fringe benefit obligations by furnishing fringe benefits such as health insurance and retirement plans pursuant to a bona fide plan, fund, or program, by making payments in cash, or through some combination thereof. 41 U.S.C. § 6703(2); 29 C.F.R. § 4.170(b). Contributions to a bona fide fringe benefit plan, fund, or program must be irrevocably made. 29 C.F.R. § 4.170(b).

28. The SCA regulations prohibit service contractors from taking credit towards their fringe benefit obligations for any cost that is "properly a business expense of the contractor" or "primarily for the benefit or convenience of the contractor." 29 C.F.R.§ 4.171(e). Although the costs incurred by a service contractor's insurance carrier, third-party trust fund, or other third-party administrator that are directly related to the actual administration and delivery of benefits can be credited towards the contractor's fringe benefit obligations, administrative costs incurred by a service contractor in connection with merely providing fringe benefits to its service employees "are properly a business expense of the employer" that may not be deducted from the required fringe benefit rate: "No deduction from the specified amount may be made to cover any administrative costs which may be incurred by the contractor in providing the benefits, as such costs are properly a business expense of the employer. 29 C.F.R. § 4.172[.]".

29. The SCA regulations also specifically require service contractors to keep records of, among other items, the name and other personal identifying information of each employee, the "rate or rates of monetary wages paid and fringe benefits provided," and the "total daily and weekly compensation of each employee." 29 C.F.R. § 4.6(g)(1).

30. Defendants used Plan assets to pay Axim to perform administrative tasks that were principally for the benefit or the convenience of IntellecTechs as an SCA-covered federal contractor. Where an SCA contractor elects to satisfy all or part of its SCA health and welfare obligations by making contributions to a fringe benefit plan on behalf of its employees—here, the IntellecTechs, Inc. 401(k) Profit Sharing Plan—the contractor must, as noted above, make irrevocable contributions of at least the required amount[1] for each eligible employee based on their hours worked on a covered contract and keep a record of these contributions. *See* 29 C.F.R. §§ 4.6(b), (g)(1), 4.170(b), 4.172. Here, Axim helped IntellecTechs perform these functions by computing total fringe benefits owed, computing health and welfare benefits owed, and acting as an intermediary between IntellecTechs and the Plan's asset custodian, John Hancock. Axim forwarded fringe benefit contributions that were made by IntellecTechs (and its employees) from the Trust to John Hancock, kept track of the disbursements Axim made from the Trust to John Hancock based on IntellecTechs' employees' hours worked—records that IntellectTechs was specifically required to keep under the SCA, *see* 29 C.F.R. § 4.6(g)(1) (requiring SCA contractors to keep a record of, among other items, the "rate or rates of . . . fringe benefits provided")—and performed other recordkeeping activities associated with payroll administration, namely monitoring and updating personnel records when IntellecTechs employees were hired or separated from employment. Axim also provided information to employees regarding IntellecTechs' contributions to their 401(k) accounts, and it prepared SCA compliance reports for IntellecTechs and represented that it would assist IntellecTechs if

---

[1] As stated above, for covered federal contracts during the period at issue, contractors were required to provide health and welfare fringe benefits ranging in value from $4.27 per hour to $4.80 per hour. See WHD All Agency Memorandum 217 (June 30, 2015); WHD All Agency Memorandum 239 (June 23, 2022).

9

IntellecTechs were investigated by the Department of Labor. None of these activities performed by Axim were directly related to the administration and delivery of the fringe benefit IntellecTechs provided to its employees, a 401(k) retirement plan under which another third party (John Hancock) actually managed employees' retirement accounts, along with health and welfare benefits. Although nothing in the SCA prohibits a contractor from hiring a third party like Axim to perform the activities that it performed rather than performing them itself, because Axim's activities were principally for the benefit or convenience of IntellecTechs, the cost of these activities was a business expense for IntellecTechs. Defendants thus used Plan assets to pay their own business expenses, which benefited themselves rather than the Plans' participants and beneficiaries.

31. By using Plan assets to pay Axim's PEPM fees, Defendants failed to hold the Plan assets in trust for the exclusive benefit of the Plan participants and beneficiaries, which violated ERISA Sections 403(a) and (c), 29 U.S.C. §§ 1103(a) and (c).

32. Defendants used the Plan assets to pay fees that were not reasonable expenses of administering the Plan and failed to loyally and prudently discharge their fiduciary duties, in violation of ERISA Sections 404(a)(1)(A) and (a)(1)(B), 29 U.S.C. §§ 1104(a)(1)(A) and (a)(1)(B).

33. Defendants are liable as co-fiduciaries under ERISA Section 405(a), 29 U.S.C. § 1105(a), because they knowingly participated in the use of the Plan assets to pay employer expenses, enabled each other to commit these breaches, and knew of the breaches but failed to make reasonable efforts under the circumstances to remedy them.

34. Because Axim was a party in interest to the Plan, Defendants engaged in a prohibited transaction when they transferred Plan assets to Axim, in violation of ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

35. Because Defendants are also parties in interest, this transfer for the benefit of Defendants violated ERISA Sections 406(b)(1) and (2), 29 U.S.C. §§ 1106(b)(1) and (2).

36. As the result of their conduct described above, Defendants caused the Plan to suffer losses of at least $144,521.89, plus lost earnings, for which they are liable, pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

## COUNT II

### Failure to Forward Employee Contributions to the Plan

37. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 35, inclusive.

38. By failing to forward more than $38,000.00 in employee withholdings for employee contributions, Defendants did not hold Plan assets in trust and allowed Plan assets to inure to the benefit of themselves, which violated ERISA Sections 403(a) and (c)(1), 29 U.S.C. §§ 1103(a) and (c)(1), and failed to loyally and prudently discharge their fiduciary duties and to follow Plan documents, which violated ERISA Sections 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D). Defendants are liable as co-fiduciaries under ERISA Section 405(a), 29 U.S.C. § 1105(a), because they knowingly participated in these fiduciary breaches, enabled each other to commit these breaches, and knew of the breaches but failed to make reasonable efforts under the circumstances to remedy them. Defendants engaged in prohibited transactions by using Plan assets for their own benefit, in violation of ERISA Section

406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), dealing with Plan assets in their own interest, in violation of ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), and acting on behalf of a party with interests adverse to the Plan, in violation of ERISA Section 406(b)(2), 29 U.S.C. § 406(b)(2), 29 U.S.C. § 1106(b)(2).

39.    As the result of their conduct described above, Defendants caused the Plan to suffer losses for which they are liable pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

## COUNT III
### Failure to Timely Forward Employee Withholdings

40.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 38, inclusive.

41.    By forwarding other employee withholdings up to 160 days after they were due, Defendants did not hold Plan assets in trust and allowed Plan assets to inure to the benefit of themselves, which violated ERISA Section 403(a) and (c)(1), 29 U.S.C. §§ 1103(a) and (c)(1), and failed to loyally and prudently discharge their fiduciary duties and to follow Plan documents, which violated ERISA Sections 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D). Defendants are liable as co-fiduciaries under ERISA Section 405(a), 29 U.S.C. § 1105(a), because they knowingly participated in these fiduciary breaches, enabled each other to commit these breaches, and knew of the breaches but failed to make reasonable efforts under the circumstances to remedy them.

42.    As the result of their conduct described above, Defendants caused the Plan to suffer losses for which they are liable pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary of Labor prays that this Court enter an Order:

1. Requiring Defendants to jointly and severally restore all losses, including interest, they caused to the Plan;

2. Requiring Defendants to jointly and severally make equitable restitution to the Plan of all losses resulting from their fiduciary breaches, including interest;

3. Awarding the Secretary her costs incurred in this civil action; and

4. Granting such other relief as may be equitable, just, and proper.

Respectfully submitted,

Mailing Address:

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968
O: 215-861-5113
Kuschel.elizabeth.a@dol.gov

UNITED STATES DEPARTMENT OF LABOR

Jonathan Snare
Acting Solicitor of Labor

Samantha N. Thomas
Regional Solicitor

Alejandro A. Herrera
Acting Regional Counsel for ERISA

Elizabeth A. Kuschel
Counsel for Wage and Hour
VA Bar No. 100843